This is case number 4-14-0773 in re the marriage of Lindsey Tedrick and Jonathan Tedrick. For the appellant we have attorney Michelle Backlund and for the attorney we have attorney Stephanie Schultz. Ms. Backlund are you ready to proceed? I am ready. Thank you so much. Thank you. May it please the court, counsel. We are here before this court today on an appeal from the circuit court in Logan County denying appellant Lindsey Tedrick's petition to remove her minor child from the state of Illinois to the state of South Carolina. The law of the state of Illinois is derived from two Illinois Supreme Court cases on the issue of removal. The first being the Eckert case which originally set forth the factors that were to guide the court in determining whether or not removal was to be granted. Followed then almost a decade later I believe by Colin Borne that further explained at least one of the factors in Eckert and how it should be applied to these cases. The issue in this particular case, your honors, from my client's perspective and from my perspective is that the court in this case treated the Eckert factors more like they were mandatory elements each of which individually had to have been met rather than a set of factors that were to guide the court and that were to be balanced in this case. In doing so, the circuit court gave little more than lip service to Ms. Tedrick's best interests and the effects that those profound improvements in her lifestyle, in her employment, in her physical health and in her mental health were going to have on her daughter's own well-being. In this case before the court, the trial court viewed the decrease in the frequency of visits as the most important of the Eckert factors and that it trumped all other factors. The result of this view is that Lindsay now is being denied the opportunity to improve both her and her daughter's life simply because the every other weekend visitation schedule cannot now be maintained between South Carolina and Illinois. The question that should have been before this court should have been not whether the exact visitation schedule could be maintained but whether or not a permanent relocation could be done and a visitation schedule put together in a way that would allow this minor child and her father to maintain their relationship that they had had while this child lived in Illinois. The trial court unfortunately lost sight of the fact that the Eckert factors need to be balanced and gave almost exclusive weight to that visitation issue. Is it a serious issue? It is a serious issue, Your Honor, but in an ever so mobile society, it becomes or has become over the years, particularly the years following Eckert, it has become an issue that has come up more and more and more often in front of not only the trial court but I believe with regard to all of the cases that have followed in this court, it has become a significant issue in this court as well. Whether or not people are relocating for remarriage, which is not the case for my client, whether they're relocating for economic circumstances, which in part was the reason for my client, we are living in an ever more mobile society than we were even when Eckert was heard by the Supreme Court. Now as with regard to the first Eckert factor, which is the likelihood of enhancing the general quality of life for both the custodial parent and the child, the memorandum of decision issued by the court took painstaking detail to make sure it outlined all of the Eckert factors. The problem with that first factor is when you review the evidence, particularly the evidence that was actually pointed out very specifically by the court that it heard and that it thought was appropriate and relevant in this case, the court somehow came to the inexplicable conclusion that that factor should be weighed in favor of Mr. Tedrick. The court highlighted in its memorandum of decision some of the benefits that it believed this child and my client, Ms. Tedrick, were going to be receiving as a result of relocating down to South Carolina and specifically said that the court believes that removal to Lexington, South Carolina, would be of great benefit to the petitioner. Citing both the better working environment, going from 60 to 70 hours at her current employment, down to 37 and a half hours per week in South Carolina, removing the fear that she was going to be terminated from her employment, which was an ever present fear when she was at her employment in Illinois. The court talked specifically about the health concerns that Ms. Tedrick had been experiencing while she was at her employment. She had been diagnosed with situational depression. She was suffering from migraines, weight loss, insomnia, and had begun to lose her hair, all issues which had resolved themselves in the approximately two and a half months that she had been in South Carolina and in this new employment position. The court specifically noted that less workplace stress would certainly assist in the minor child's transition and improve the minor child's relationship with her mother, which, as Ms. Tedrick testified, had become somewhat strained because she did not have the time or energy, because of her employment up here, to be the kind of mom that she wanted to be to her daughter. In addition to that, the court noted that one of the reasons that my client chose South Carolina as a final destination when she could not find new employment in Illinois was because her mother, her father, and her sister lived there, which of course was going to give her a support system if she were allowed to permanently relocate down to South Carolina. She works at the University of South Carolina in Columbia? That is correct. And lives in Lexington? That is correct. There is no branch in the University of Lexington that is there? I don't know the answer to that. Thank you. The court specifically noted the opportunity for the minor child to create friendships in Lexington, and based upon the limited evidence that was provided to the court, the court acknowledged that the Lexington School District appeared to be a better school district than the Zion Lutheran School that the child had been attending. The court placed in its consideration of this likelihood of a better life for this child, the court seemed to place a considerable emphasis on the relationship that the paternal grandparents particularly had with this minor child. And I would note for the court that that particular issue was actually addressed by this court in a case called Inlay Eaton, which involved a mother who had remarried to a gentleman in Florida, was petitioning to remove her minor children to the state of Florida, but had had a very significant relationship with the paternal grandparents here in Illinois. And the court in that case, in finding that mom, this court in that case, in finding that mom should be permitted to go to Florida, said that while the custodial parent has a duty to foster a relationship between the children and the non-custodial parent, that duty does not require custodial parents give up their right to pursue a new life, which is exactly what Ms. Tedrick is trying to do in this case. A life that she believes is going to be better for her daughter, it is going to be better for herself, and ultimately that's what Colin Bourne suggested that this court needs to be looking at, or the trial court needs to be looking at, when determining whether or not a removal should be granted. Specifically, Colin Bourne said that the benefits to a parent, a custodial parent, and the benefits to a child are inexplicably tied to one another, particularly when it is recognized that that child and that parent, that that custodial parent is the person that is definitively rearing this child. And the circuit court recognized, the circuit court in this case recognized in its finding that Lindsay, and I quote, according to both parties, has been the party primarily responsible for this child's care. The evidence was, that was presented to the court, that by agreement of Mr. Tedrick, Ms. Tedrick takes care of the medical decisions concerning this minor child, takes care of the school decisions concerning this minor child, and that he did not really involve himself in those matters, including in the last school year before they transferred to, or temporarily relocated to South Carolina. Ms. Tedrick specifically had issues at Zion Lutheran School that she had addressed to the teacher there, and she explained to Mr. Tedrick that she was having issues with Zion Lutheran School, and Mr. Tedrick not one time, he testified, went in and tried to speak to the teacher about what those issues were, or any sort of, make any sort of attempt to try and resolve those issues. Now, with regard to the second accurate factor, I believe the second and third accurate factors do not necessarily apply one way or another in this case, they were both weighed. The second factor, meaning my client's reasons for her desire to move to South Carolina was weighed in my client's favor. I don't believe there was any evidence that she was relocating for any untoward purpose, and the court did not find any untoward purpose in her decision to relocate. The third accurate factor being Mr. Tedrick's reason for wanting the child to stay. My client completely understands why Mr. Tedrick would want the child to stay, and so she didn't even question the motivation for his reasoning for objecting to the relocation. Now, the fourth accurate factor, and probably the one, according to the memorandum of decision, that was certainly most troubling for this court, was the court acknowledged that the travel considerations in this case weighed very heavily upon him in making a decision. And as I said previously, I think he gave undue weight to that factor. The Supreme Court in Eckert specifically said that a reasonable visitation schedule is one that will preserve and foster the child's relationship with the noncustodial parent. However, it made no rigid requirements in terms of hours or travel time, and the court specifically said that reasonable is going to vary case to case, and that whether a child's relationship with the noncustodial parent will be preserved, recognizing the circumstances, are not likely to be ideal in any case, is what the court really should be concerning itself with. In this case, I mean, they're putting a 7-year-old on a plane, and I need her alone to fly from South Carolina to Illinois. That's correct. And there aren't really, she can't find her, I don't know how far, how far is Duet from Lincoln? Duet from Lincoln is 30 minutes, roughly. And which church? I don't know where Duet is. Duet's over by Clinton. Northeast. Yes, thank you. There's not really a good option for an airport where she can fly nonstop. That's not true. There's actually, there's a nonstop flight that goes into Bloomington, which would, that comes out of Atlanta, Georgia, goes into Bloomington, so it would be a 30-minute drive, much like it would be if you were doing his visitation in Lincoln. She would get a flight to Georgia. It's a two, roughly a two-and-a-half-hour drive for my client to take her to Atlanta, Georgia. There actually, there are, there were four direct flights that my client could find that would get the child within the proximity of Duet. Obviously, one flew into Chicago, and that was the closest one as far as distance from my client, from her house to the airport. But of course, on the back end, it's a two-and-a-half-hour drive for Mr. Tedrick. There's one, of course, that goes directly into St. Louis. There's one that goes into Indianapolis. And then there's this particular one that goes into Bloomington. So there were options for transportation, and those were laid out before the court. You're not suggesting that it's improper for the trial judge to consider the effect of this trample on a seven-year-old who's traveling by herself. No, I do not, Your Honor. But I would suggest to this court that the child, by the time we came to trial, had already made this plane trip, I believe, on two or three occasions alone, and there had been no issues with regard to the travel arrangements or the flight arrangements that had been made. My understanding is the parent accompanies the child all the way to the gate, and then the personnel from the airline takes over, and when they land, the other parent meets them at the gate. So the child doesn't spend any time in the airport by herself in these kinds of circumstances. The only time that she's alone is, of course, when she's on flight. So while I recognize that it's not an ideal circumstance, there are children that do these flights by themselves, and I recognize, again, that seven is a young age to do that, but I don't think that it is unheard of for a child to make that kind of commute to see a parent that lives out of state. I mean, frankly, this would be no different than if Mr. Tedrick made the decision to move out of state and we were to have to accommodate a visitation schedule. I mean, none of us would be suggesting that he just doesn't get any visitation because now we can't accommodate a visitation schedule for him without putting this child on an airplane. So if that's true, then the flip, which is this case, should also be true. You know, my client should not be bound to the state of Illinois forever when she has no reasonable means of employment here simply because no one wants to put this child on a flight a couple of times a year to come and have extended visitation times with her father. The terms of hustle noted that your client did not apply to any other university in Illinois. She did not apply with any other university, and why she did not do that, Your Honor, I do not know. I know that she applied at a number of different employers in the area. I think initially she was trying to stay as close as she could, which is why she was looking, I believe, in Dixon and in Peoria, and when that didn't pan out, she broadened her search to Chicago and had applied to some hospitals in Chicago and had not had any even offers of interviews at any of those potential employers. And she started her search in January of 2014 and finally decided to search outside of the state of Illinois in April, so she had given it approximately four months trying to find some other place where she could land as far as employment went so that she could get out of the situation that was not a very good situation for her. And, Your Honor, it's important to note, too, that if she were to have chosen and had an interview at a place inside the state of Illinois, it likely would not have been in the Lincoln area and would have required a relocation, most likely to a place where she had absolutely no support system at all, because she has no family in the Central Illinois area, no immediate family in the Central Illinois area. I think she testified she has an aunt or maybe an aunt and a couple of uncles that she wasn't particularly close to, and she has no other family in Illinois. So had she relocated to Chicago or had she relocated to St. Louis, she wouldn't have had a support system at all. Were the paternal grandparents in Lincoln? Yes. And they were providing daycare to the child? That's correct. Throughout her entire life? That's correct. How much weight did the childcare pay in making that decision? My impression of how much weight they gave to that was a significant amount of weight. They repeatedly referred to the situation or the environment that had been created by the paternal grandparents in this case. Are you referring to the trial court? Yes, I am. I'm sorry. I wonder if there was argument from either side. Well, it's both. I was referring to the trial court, but there was a significant amount of evidence put before the court from both paternal grandmother, paternal grandfather, and father about the relationship that the paternal grandparents had with this child. My client disputed much of that, meaning disputed much of the relationship outside of the childcare setting. I mean, my client's... Well, they saw the child every single day during the school year, right? Right. Right, after school, because they would have her after she got off the bus. Did they provide daycare when she was a newborn? Yes. The party basically cared for her entire life. That's correct. That's correct. And the court noted that, and I believe gave probably more than due consideration to that, because while I recognize that the grandparents, the paternal grandparents, have an important part in this child's life, I recognize just as much that the opportunity that the maternal grandparents are now getting to have a relationship with this child, which was testified to about how often they're seeing this child. Initially, when my client went down there with the child, they were all living together, including the aunt. My client, of course, subsequently moved into her own apartment along with the child, but the child is still having a significant relationship with her grandparents and with her aunt that are down there. So I don't think that it is necessarily fair to weigh one set of grandparents against another when I think that they're all important in bringing up this child. One of the other errors that I believe that the trial court made, and it's a significant error, is the trial court, in its memorandum of decision, states that the father has 50% of this child's time and he could not fashion a visitation schedule that would accommodate a 50% schedule. And the evidence before the court was simply that that was not true. I mean, this father had been exercising a very limited schedule of visitation up until about six months prior to our hearing, meaning one night every other weekend and an hour to an hour and a half two times per week. Only in the six months prior to this trial had he moved his visitation schedule or expanded his visitation schedule to include that second day of the weekend, which he had been granted originally in the divorce and just had never taken for a number of reasons, which were presented to the trial court, one being the comfort of the child, the other one being some things that he had going on for himself. I see that I'm out of time. I'm sorry. Well, you'll have time on the phone. Thank you. Okay. Let's see. Ms. Schultz, you're ready? Yes. Okay. May it please the court. Counsel. Counsel has intimated to the court today that the main contention and issue here today is that the trial court has erred in its decision at the lower court level, mainly because the lower court made too much of an emphasis in that when looking at the Eckert factors, the Eckert factors were looked at as mandatory elements to guide the court and basically gave lip service to her client's needs and therefore those of the minor child. Obviously, my client takes issue with this, and we have made such an argument when writing our brief in this situation. When looking at the case law in this situation, obviously the case law is quite deep, and there are several cases in this. It started with Eckert, but it didn't stop there, and we all know that. One case, we do start with Eckert, but Eckert is a balancing test. I do agree with counsel. Eckert is a balancing test. The first case that we come to is the Smith case, which is also an Illinois Supreme Court case in 1996, and the Smith case was quite clear. This is a balancing test. It is not one factor, and what we believe the petitioner and what Ms. Tedrick wants this court to do is actually focus on the first factor of the Eckert test. Look at the enhancement that the life that Ms. Tedrick and then the trickle-down effect and the enhancement that the move to South Carolina is going to have on this young lady. This happens in many of the cases that have taken place and that have been ruled upon in not only the Fourth of Hope District, but in several of the cases in the Third District and some of the other Supreme Court cases. However, when looking at the matching case, which was ruled upon in 2007 in the Second District, that case also, parents again were set in the Smith case. The matching case is very specific wherein it says, even if the appellate court or the reviewing court does not agree necessarily with a decision that was made at the circuit level, because the level of review is a manifest way of evidence, it doesn't mean that the appellate court should overturn the decision that was made at the circuit level. When reading the letter ruling and the decision that was made at the circuit level on this case, it is apparent that the circuit judge took painstaking time to make this decision. He looked at all of the factors. The first factor, which is whether or not the lives of not only Ms. Tedrick, but this young lady will be enhanced by the move to South Carolina. The judge actually did indicate that yes, Ms. Tedrick's life will be enhanced by the move to South Carolina. But after weighing all of the evidence, and he is the one that had the opportunity to look at the evidence, and all of the case law when looking at various case law indicates that he is the one who had the best opportunity to review all of the witnesses, he indicated that the minor child who weighing all the factors in front of him, her life would not be enhanced because she had a good life where she was. She told her guardian and item she wanted to stay in Lincoln, Illinois. She has a good life no matter where she goes. She has loving parents in both places. She wouldn't be living in Lincoln, Illinois, would she? Ms. Tedrick actually still has a home that she has not sold in Lincoln, Illinois at this point. Well, can I see what you're saying? Yes, Your Honor. If she'd stayed there. Yes, Your Honor. But not necessarily eventually, I suppose. Not necessarily eventually. However, Ms. Tedrick did testify, and I believe the record indicates that she would maintain her home in Lincoln at this point. And the record is unclear because the testimony at trial wasn't clear where Ms. Tedrick had actually applied for jobs. The only place that's indicated where she applied for employment was in the guardian and item report. It wasn't very clear in the record at trial. Therefore, when the judge indicated, when the Supreme Court was disputing the problems that she testified to concerning her employment at the Lincoln College, right? We disputed it to a certain point, Your Honor, due to the fact that it's in the record that the interim president did testify that Ms. Tedrick's view and perspective about where she stood with the university was her perspective and that she was not in any danger. The interim president did testify that she was not in danger of losing her job, that they in no way believed that she should step down, that they were hoping to take some of that pressure off of her by finding somebody to help her out. That they were not looking to get rid of her and maybe alleviate some of those hours she was working. Well, the record shows that, well, let me ask this. Are you disputing any of the evidence concerning how the job is affecting her personally? We don't dispute that she didn't like her job and that the job was affecting her personally, but my client did. And physically. And physically. My client did testify, and it is in the record, that she had not liked her job and she was having issues with her job even prior to the divorce. So we don't dispute that she didn't like the job, no. Well, but the point is she's been, under any circumstance, it sounds like it would be reasonable for her to be looking for a job elsewhere. Correct. Because she found a job in Waukegan, so did. That's correct. But this is a joint parenting agreement, and also the joint parenting agreement in this particular situation required the two parties to look at the joint parenting agreement and its feasibility every six months. And rather than do that, Ms. Tedrick chose to find a job in South Carolina. There are other universities closer. There's a university in Eureka. There's a university in Bloomington, Illinois. There's a university in Decatur, Illinois. There's a university. There are universities much closer that we heard no testimony as to whether or not Ms. Tedrick looked for work at those universities. With the type of experience that she has, we heard none of that information whatsoever. So what was the testimony concerning that in trial? The testimony in trial was absolutely no testimony in trial. The testimony in trial was simply that she's much happier in South Carolina. She's gained five pounds. She stopped having migraines. Her hair stopped falling out, and she's glad she's living with her parents. Well, she testified, didn't she? She did testify. Did you confront her with her failure to seek jobs in Illinois? I confronted her with her lack of looking for jobs in Illinois, and I frankly can't recall. What did she say? She said that she looked for some jobs, and I believe what her counsel just responded to was, I looked for some jobs I received in one interview, and I received no responses from the others. Did you ask her specifically if she looked for jobs at any of these universities you just mentioned? No, Your Honor. Why not? It didn't come up at that time. I probably should have. Okay. With regard to the issue that was mentioned in the balancing test, as I've stated, there is the matching case that indicates that this is, in fact, a balancing test. And again, in the Smith case, which is very similar to this case, the court denied removal in the Supreme Court, indicating that the parents or that the mother who wanted to move with the children would not be allowed to remove the children out of the state of Illinois due to the fact that, for the very same reasons that were found in the case at hand, that for one reason, travel to and from New Jersey was just too much for a teenage child to endure because there were no direct flights. There was no direct travel for a minor child. And in that situation, the child in the case in Smith out of the Supreme Court didn't have a very good relationship with her father, and the court didn't want to further damage that relationship. In the case that we have, this young lady has a very close relationship with her father. In addition, as counsel has already stated, the factors two and three really don't matter here. And when you look at factor four, which is the factor of the relationship with the father and the minor child, this is, as the court pointed out, this is a joint custody arrangement. This is not a case of sole custody. Mom didn't have sole custody. These parents had joint custody. And when Mom made the decision to move to South Carolina, it would have a drastic effect and an adverse effect on the visitation arrangement between dad and child. And not just dad and child, but what was very striking in this particular situation, and this is supposed to be done on a case-by-case basis, this is not supposed to be done just based on case law, but on a case-by-case basis. This is a seven-year-old little girl. She just turned seven. Actually, she turned seven during this case. Her relationship with her father will not only be affected, but to expect this young lady to be away from her mother for extended periods of time at this tender age, the judge believed that this would not be fair to this little girl at this particular time. And... Was Ms. Blackbone correct when she says that your client was exercising less of the visitation that he was entitled to up until six months before? The reason that judge and my client actually testified to that, and it's also in our brief, was due to the fact that my client indicated during his testimony, and again, Your Honor, we placed that in our brief, my client had a difficult time even during the marriage having a meaningful relationship with the minor child because Ms. Tedrick is a, for lack of a better term, a helicopter parent. Those are my words, not my client's words. And he testified that his relationship with the minor child actually got better after he was granted the joint parenting agreement because then he had to find parenting time with the little girl. So the first six months, he was very sensitive to the child's needs in working her up to a visitation agreement to make her more comfortable. He had no idea that within the first year of the joint parenting agreement, and he also testified to that, he'd be facing a removal of his little girl to the state of South Carolina. If he had any idea, he probably would not have been as so moving in enforcing his parenting time as he was. He was thinking of his child's best interest, and he was working her into the parenting agreement. He was not being a raggadazio parent. He was actually being an understanding parent. And that's why his testimony was that he was glad that he was able to enter into the joint parenting agreement because he actually knew when he was going to get her. So then in May of 2014, when his hours changed and he was no longer on the shifting schedule through the security at Exelon and he went into the industrial cleaning and he was able to work a day job Monday through Friday, he was so excited because now he was going to have time to spend even more time with his daughter. Exact same day and week that he was told his daughter was being taken to South Carolina. So this was quite the shock for Mr. Tedrick, which is another reason why I believe the lower court looked at the Chenal and Carter case of 2012, out of the third district and indicated that removal will have an adverse effect on this young lady's relationship with the father because she's not going to have the opportunity to build up that relationship that Mr. Tedrick had been working so hard to gradually build up. It's mildly disingenuous, and I don't think that it's counsel's attempt to be that way. However, these parties had only been working under the joint parenting agreement for barely a year when this temporary removal took place and Mr. Tedrick had just moved to DeWitt. He was working on his house when he didn't exercise his first summer, 2013, his two weeks of visitation in the summer of 2013 because he was putting a roof on the new house that he had just purchased so he could have a nice place to take their daughter. He's only 20 minutes, he's 30 minutes away. It's closer to where he works. Everything that Mr. Tedrick was doing was because he has a new life that he was hoping to live with this little girl. He had, again, no idea that things were going to change so drastically in June of 2014. And he did object. It's in the brief that was filed by Ms. Tedrick. He did, in fact, object to the flights and to his little girl flying by herself as an unaccompanied minor. Did you talk to the GAL about this? Did the child talk to the GAL? Was that included in the report? About the flights? Yes. I don't recall anything about the flights being mentioned by the Guardian, or the child's objection to such flights. I know my client did testify that he believed the child was upset by the flights, and he does object to the fact that there's substantial drive time on both ends of the flights and that this child is essentially, in his opinion, enduring no less than a 10-hour travel day every time she travels due to the fact that she's in a vehicle for two and a half hours on each end, and then the time required in an airport at seven years of age. And that is what the court was taking into consideration at seven years old. Once she gets into this routine after a certain amount of time, he believes it's going to affect her desire to want to come and visit after a while. And based on the case saw, based on the Chenal case, and what the trial court indicated, my client does not believe that what the trial court stated was against the manifest way to the evidence. The counsel indicated that this is very much like the Eaton case. This is not like the Eaton case. In the Eaton case, those parties had actually been married prior. They had already lived in the state of Florida, and the mother had moved to the state of Illinois with the children prior. So Dad had already lived separate from these children before and understood how to have a long-distance relationship with his children. Then Dad followed the family to the state of Illinois. Following, Mom wanted to go back to Florida. With regard to the extended family, the extended family had a condo in the state of Florida. So the extended family could continue their relationship with the children in Florida because the extended family could go back and forth from the state of Illinois to Florida. We don't have that here. This little girl only has her family, her extended family in Illinois, and will only see them when they come back and forth. And this is family who has been with her since birth every single day. So she will be substantially, it's going to impact her substantially, and we respectfully request that the ruling from the circuit court be affirmed and that it not be affirmed to be against the manifest way of the evidence. Thank you. Thank you, Counsel. Ms. Pfeiffer, you may go. Thank you. Your Honors, briefly, following up Justice Pope on your question with regard to any questions from the GAL or any statements by the child as to any travel problems, I just reviewed the GAL's report in her interview with the child, and indeed there is no reference in there that the child was experiencing any travel problems or, frankly, that her and the guardian ad litem even discussed travel or travel issues except for they had a brief discussion about, you know, would you be okay living in South Carolina and visiting your dad here? Yes. Would you be okay living here and visiting your mom in South Carolina, living with your dad here and visiting your mom in South Carolina? Yes. So they had that very brief discussion, but other than that very brief discussion, it appears that they had no significant discussion about any sort of transportation. Yes, she had because she was back here. It was July 21st. She was back here, I believe, visiting her father for his two weeks of summer visitation during that actual appointment or that actual meeting. I asked Ms. Stolz about that when it was intended for testifying. She had asked her about the pursuit of job opportunities in public universities in the state of North Carolina. She had stated and wanted to mention that she was looking for a spot. She said she had asked, and you could have asked as well. Did you? No, Your Honor. I asked Ms. Tedrick where she had applied for jobs in the state of Illinois, and she ran through the list of where she had applied and what interviews, if any, she had received, and that was the sum and substance of the testimony. Well, at the time, she had worked for the college for several years, hadn't she not? She had, Your Honor. In what capacity? Something to do with accounting. Kind of a specialized role. Right. I would agree. I'm a little troubled, and frankly, if I were the trial judge, I probably would have asked myself. It seems to me that with Milliken and ISU and Westman and colleges around, that would have been an interesting thing to hear. In fact, it's a bit troubling if maybe she simply declined to even look. That would be kind of a problem, wouldn't it? I would agree, and I don't know why she didn't look. I don't know if there weren't any job opportunities available. I don't know what the reasoning would have been. I mean, this would have been, she would have been looking in January, so it would have been. What did Judge Funk say about this failure of hers to look into possibly introducing a college employment? Well, Judge Funk's memorandum of decision specifically states that he made a finding that she made efforts to, reasonable efforts, to find employment in the state of Illinois, and so he took no umbrage with her decision to look for employment opportunities outside of the state of Illinois. Go ahead. I don't want to take up all your time. That's okay. Thank you, Your Honor. Your Honor, I would only say one thing about this Machen case that was cited by Ms. Tedrake. First, excuse me, Ms. Scholes. First of all, that is a second district case, so of course it's not binding at all upon this court, and in addition to that statement, I would also say to you that Justice Bowman issued a very lengthy and strong dissent in that case about all of the reasons that he believed that the echo factors were not followed when a decision was made by the trial court. Your Honor, Justice Pope, with regard to your questions about the lack of involvement of Mr. Tedrake or him not exercising all of his time that was available to him with the child, I do not recall any testimony, and I may be wrong about this, but I don't believe that I am. I don't recall there being any testimony about my client being a quote-unquote helicopter mom that was somehow preventing Mr. Tedrake from having contact with his child prior to a schedule being put into place. My recollection of the testimony of both parties was that Mr. Tedrake's employment situation, he worked some sort of swing shift, that his employment situation was the biggest factor in why he did not have a regular and consistent visitation schedule with the minor child, even before one was actually in place, and that and also the fact that the child initially wasn't comfortable spending more than one night a week, one overnight a week with her father. So I don't think it's fair to say that Ms. Tedrake was overly involved in the visitation or lack thereof of Mr. Tedrake. I believe that falls squarely upon him. Whether he could control it or not because of his work situation is something that I don't know. But at any rate, based on all of the evidence that was presented to the court, my client firmly believes that this court erred in refusing to grant her petition for removal and is asking this court to reverse that decision. Thank you.